```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
```

SAMUEL DUNWOODY,                              **DECISION AND ORDER**
        Petitioner,                **No. 10-CV-6273(MAT**)

  -vs-

WILLIAM D. BROWN, SUPERINTENDENT
EASTERN CORRECTIONAL FACILITY

        Respondent.
_____

## I.  Introduction

*Pro se* Petitioner Samuel Dunwoody ("Petitioner") has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered November 17, 1993, in New York State, Supreme Court, Erie County (Hon. Joseph S. Forma), convicting him, after a jury trial, of Murder in the Second Degree (N.Y. Penal Law ("Penal Law") §§ 125.25 (1), 20.00).  Petitioner was sentenced to an indeterminate term of imprisonment of twenty-two years to life.

For the reasons stated below, habeas relief is denied and the petition is dismissed.

## II. Factual Background and Procedural History

Under Indictment No. 91-0848-001, Petitioner, along with co-defendants Terrance Davis ("Davis") and Brenton Beckford ("Beckford"), was charged with one count of Murder in the Second Degree (Penal Law §§ 125.25 (1), 20.00) and one count of Criminal

Possession of a Weapon in the Second Degree (Penal Law §§ 265.03, 20.00). The charges against Petitioner arose out of his participation in the shooting death of John Parham ("Parham" or "the victim") in a parking lot outside a motel in the City of Buffalo, New York on April 15, 1991. Trial Trans. [T.T.] 5.

Then seventeen-year-old Nyree Zelenka ("Zelenka") met Davis (a/k/a Morrese Green or Moe) in April 1991. T.T. 383, 435. Soon thereafter, Zelenka agreed to go to a party with Davis in Buffalo, which required a car trip from her home in Rochester. T.T. 382-385. Davis drove to Rochester to pick up Zelenka along with Beckford (a/k/a "Larry") and Petitioner (a/k/a "Lite") who were in the car with Davis. Zelenka had met Petitioner previously and knew him as Davis's friend. T.T. 385-386. The group did not attend the party as planned, and Zelenka stayed that night at Davis's home in Buffalo. T.T. 386-387.

The following day, Zelenka asked to be returned home to Rochester, but Davis told her a ride was not available because the window of his Jeep was being fixed. T.T. 387-388. During the following three or four days while at Davis's home, Zelenka saw Beckford handle a "long" gun "with a clip that [went] underneath the handle part." T.T. 389-391.

One morning, Zelenka awoke to find that Davis was not at home. T.T. 391-392. At approximately 10:00 a.m., Davis returned home and, in the presence of Zelenka, Beckford, and Petitioner, stated

that he had "seen the mother fucker that shot his Jeep window." T.T. 392-393. Petitioner and Beckford asked Davis who he was referring to, and Davis replied that he was referring to "the guy that shot his window out." Davis then stated that he was "going to kick his ass," and Petitioner and Beckford indicated that they were going to go with Davis. T.T. 393-395. All four individuals then got in Davis's Jeep and left Davis's home. Davis was driving the vehicle. T.T. 395. Zelenka testified that she saw Beckford with the gun before the group left the house, and that he carried the gun in the waist area in the back of his pants. T.T. 402-403.

After traveling for approximately five minutes in the Jeep, the four individuals arrived at the Red Carpet Motel. T.T. 395. While traveling to the motel, Davis stated that he "was going to put lead in his ass because he didn't have time to mess up his hands." T.T. 396-397. Davis drove into the motel parking lot and got out of the Jeep, leaving the other three individuals behind. T.T. 396-398. When Davis got out of the Jeep, Petitioner moved over to the driver's seat. T.T. 397-398. Davis returned to the Jeep shortly and stated, "he was still there." T.T. 398. Beckford got out of the Jeep and followed Davis to the back of the motel. T.T. 398-399. Before going to the back of the motel, Davis told Petitioner to park the Jeep on the other side of the motel, which Petitioner did. T.T. 399-400.

While waiting in the Jeep, Petitioner looked at his watch several times and then asked Zelenka "to go see what's taking Mo and Larry so long." T.T. 400. Zelenka got out of the Jeep and walked to a fence by the parking lot and saw Davis and Beckford standing in the lot. T.T. 401-402. Zelenka returned to the Jeep and told Petitioner what she saw. T.T. 403. Petitioner and Zelenka continued to sit in the Jeep until Petitioner saw a man walking toward the Jeep. Petitioner indicated to Zelenka that the man looked familiar and that he "looked like one of those guys that be hanging with the guy that was in the motel." T.T. 404. Petitioner got out of the Jeep and confronted the man. T.T. 404-406. After the confrontation, the man ran away. T.T. 405-406.

Petitioner got back into the Jeep and turned on the music. Because the music was loud, an "older man" came out of a house nearby and asked Petitioner to move the Jeep. T.T. 406-407. Petitioner did not move the Jeep, but turned the music down. T.T. 407. A short while later, Petitioner moved the Jeep closer to the motel and kept the engine running. T.T. 407-408. Thereafter, Zelenka heard popping sounds and saw Davis and Beckford running from the direction of the parking lot toward the Jeep. T.T. 409. Beckford was carrying something in "white wrapping." T.T. 410. Petitioner asked Zelenka to open the back of the Jeep, which she did, before getting into the backseat. T.T. 411. Beckford got

into the back of the Jeep and Davis got into the front passenger seat, and directed Petitioner to drive. T.T. 410-412.

Petitioner drove as he was instructed to do, slowing down when told to do so by Davis. T.T. 412. While in the Jeep, Davis and Beckford bantered about who shot when and how. Davis indicated that Beckford "didn't get him the first time," and Beckford agreed, indicating that "he missed him the first time, he got him the second time." T.T. 412-413. Beckford also stated that Davis "finished him" and Davis agreed, stating that he [Davis] "got the best of him." T.T. 413. Petitioner, referring to the confrontation he had with the man in the parking lot, told Davis and Beckford that "some other guy be hanging on the corner" and "it was like two more he had to get." T.T. 414. Zelenka then asked Davis if he was proud of himself, to which he responded, "you damn right." T.T. 414. Parham, who had been shot in the side and in the head, died sixteen days later as a result of his wounds. T.T. 165.

After the shooting, the four individuals drove to a girl's home where Zelenka saw that Beckford had a gun wrapped in a white t-shirt. T.T. 415-416. The four individuals left the girl's home later that night and returned to Davis's home. T.T. 416-419. Zelenka left the following night on a bus headed for Rochester with Davis and Petitioner. T.T. 420-421. About one week later, Zelenka

told her sister about what had happened in Buffalo and her sister called the police. T.T. 421-423.

Several days after the shooting, Petitioner and Davis were at the home of Markita Williams ("Williams"), a friend of both men and a person with whom both men had previously lived. T.T. 245-249. While at Williams's home, Davis said to Williams, "[y]ou don't have to worry about them Niggers anymore. We got them Niggers." T.T. 251. When Green made this statement, he was referring to the incident at the Red Carpet Motel. T.T. 250-251.

About eleven months later, Petitioner was arrested on Buffalo's East Side. T.T. 203-205. While being transported to the police station, Petitioner stated, without any prompting, "I don't know Mo." T.T. 205-208. He went on to state, also without any prompting, that, "I don't go out on the street, I am from New York, I don't know anybody here . . . how could three people kill when only one person killed him. You know who it was, you got all the information, you know who killed him." T.T. 211.

A jury trial was conducted before the Hon. Joseph S. Forma, at the close of which Petitioner was found guilty of Murder in the Second Degree, and acquitted of Criminal Possession of a Weapon in the Second Degree. T.T. 678-679. He was subsequently sentenced, as a second felony offender, to an indeterminate term of imprisonment of twenty-two years to life. Sentencing Mins. [S.M.] 13-14.

The Appellate Division, Fourth Department unanimously affirmed Petitioner's judgment of conviction on March 8, 1996, and leave to appeal was denied. People v. Hill, Also Known as Samuel Dunwoody, 225 A.D.2d 1076 (4th Dep't 1996), lv. denied, 88 N.Y.2d 878 (1996).

This habeas corpus petition followed, wherein Petitioner seeks relief on the basis that the evidence was legally insufficient to support his conviction for Murder in the Second Degree as an accessory.[1] See Pet. ¶13; Traverse at ¶ 2.  Petitioner's claim is exhausted and properly before this Court.

**III. General Principles Applicable to Habeas Review**

    **A.    The AEDPA Standard of Review**

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a claim that was "adjudicated on the merits" in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." § 2254(d)(2).  A state

---

[1] In his habeas corpus petition, Petitioner lists the following grounds for relief: (1) insufficiency of the evidence; (2) that the trial court erred in failing to charge witness Zelenka as an accomplice; and (3) that the trial court's charge as to intent was erroneous. See Pet. ¶13.  In his Traverse, however, Petitioner states that, "[he] is only challenging the sufficiency of the evidence claim.  All other claims are withdrawn." Traverse at ¶ 2.  Accordingly, the Court deems all but Petitioner's sufficiency claim withdrawn, and considers only that claim in this Decision and Order.

court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not *dicta*) of the Supreme Court existing at the time of the relevant state-court decision. Williams, 529 U.S. at 412; accord Sevencan v. Herbert, 342 F.3d 69, 73-74 (2d Cir. 2002), cert. denied, 540 U.S. 1197 (2004).

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. Williams, 529 U.S. at 413; see also id. at 408-10. "[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently." Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001). Rather, "[t]he state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable." Id. This increment "need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to

suggest judicial incompetence." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), cert. denied sub nom. Parsad v. Fischer, 540 U.S. 1091 (2003). A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

### B. Exhaustion Requirement

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A); see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999); accord, e.g., Bossett v. Walker, 41 F.3d 825, 828 (2d Cir.1994), cert. denied, 514 U.S. 1054 (1995). "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." Daye v. Attorney General,

696 F.2d 186, 191 (2d Cir. 1982) (*en banc*), cert. denied, 464 U.S. 1048 (1984).

**IV. The Merits of Petitioner's Claim**

Petitioner argues, as he did on direct appeal, that the evidence was legally insufficient to support his conviction for second degree murder as an accessory. Petitioner points to his purported lack of motive, the absence of an explicit expression of intent to kill Parham, and the lack of evidence connecting him to the murder weapon to support this claim. See Pet. ¶ 13; Traverse at 11-12. The Appellate Division, Fourth Department rejected this claim on the merits, finding that the evidence was legally sufficient to support Petitioner's conviction. Hill, Also Known as Samuel Dunwoody, 225 A.D.2d at 1076. As discussed below, this claim is meritless and provides no basis for habeas relief.

As an initial matter, the parties dispute whether this claim was properly exhausted in the state courts. See Resp't Mem. at 7; Traverse at ¶ 3. As discussed above, "[t]he exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." Daye, 696 F.2d at 191. The manner in which a state defendant may fairly present to the state courts the constitutional nature of his claim include: reliance on pertinent federal cases employing constitutional analysis; reliance on state cases employing constitutional analysis in like fact situations; assertion of the claim in terms so particular as

to call to mind a specific right protected by the Constitution; and allegation of a pattern of fact that is well within the mainstream of constitutional litigation. See id. at 194. Respondent contends that this claim is unexhausted because Petitioner framed his argument solely as a violation of state law on direct appeal, thereby failing to alert the appellate court to the federal constitutional dimension of the claim. See Resp't Mem. of Law at 7. Petitioner counters, citing to In Re Winship, 397 U.S. 358, 364 (1970), and argues that although he did not explicitly cite the federal constitutional in his appellate brief, he raised this claim in terms so particular as to call to mind the Due Process Clause of the Fourteenth Amendment, which protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt. Traverse at 7-8. As further support that the appellate court was apprised of the federal constitutional dimension of this claim, Petitioner correctly points out that, in rejecting this claim on the merits, the appellate court cited, among other cases, People v. Contes, 60 N.Y.2d 620, 621 (1983), which, in turn, cites Jackson v. Virginia, 443 U.S. 307, 319 (1979). Under these circumstances, the Court agrees with Petitioner and finds that he fairly apprised the Appellate Division of the federal constitutional dimension of his claim. After the Appellate Division rejected this claim on the merits, Petitioner then raised this claim in his leave application to the New York Court of

Appeals.  See Resp't Ex. C.  Accordingly, the claim is exhausted for purposes of federal habeas review, and the Court now turns to the merits of the claim.

A petitioner who challenges a conviction on the sufficiency of the evidence bears a "very heavy burden."  United States v. Quattrone, 441 F.3d 153, 169 (2d Cir. 2006); Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002).  The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crimes with which he is charged.  See Fiore v. White, 531 U.S. 225, 228-29 (2001)(per curiam); Jackson, 443 U.S. at 315.  A habeas petitioner claiming that there was insufficient evidence supporting a conviction is thus entitled to relief under 28 U.S.C. § 2254 only if "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 324; see Schlup v. Delo, 513 U.S. 298, 323 n.38 (1995).  This inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 506 U.S. 390, 402 (1993)(emphasis in original).  The habeas court is required to consider the evidence in the light most favorable to the prosecution, and draw all inferences in its favor. Jackson, 443 U.S. at 319.

Here, Petitioner's guilt was proven through a theory of accomplice liability. A person is criminally liable for the conduct of another when that person acts with the mental culpability required for the commission of the crime and either "solicits, requests, commands, importunes, or intentionally aids" the actor in the commission of the crime. See Penal Law § 20.00. To prove Petitioner's guilt of Murder in the Second Degree, the People were required to prove that Petitioner aided his co-defendants in the commission of the murder and that he did so with the intent or shared intent of killing the victim. See Penal Law §§ 20.00, 125.25(1).

The Appellate Division found that there was sufficient evidence to permit a rational trier of fact to find that Petitioner aided co-defendants Davis and Beckford in the commission of Parham's murder and that Petitioner did so with the requisite intent. The proof at trial established that Petitioner and Davis had been friends for at least two years at the time of the murder and were either living together or staying together in Davis's home at the time of the murder, along with co-defendant Beckford. T.T. 247, 388-389. The evidence further established that Petitioner was aware that Davis wished to seek revenge towards the individual who had shot out the window of his Jeep, and that Petitioner volunteered to join Davis knowing of Davis's intention to exact revenge. T.T. 392-395; see People v. Johnson, 101 A.D.2d 684 (4th

Dep't 1984) (finding defendant's conviction of second degree murder as an accomplice supported by legally sufficient evidence where "evidence of defendant's intent was direct, substantial and unequivocal" where, *inter alia*, even "[i]f defendant did not share in [the shooter's] motivation for revenge, he at least knew of [the shooter's]."). Furthermore, Zelenka testified that during the days preceding the murder, Beckford was observed in Davis's home oiling a gun and pulling back the bolt, and that, on the day of the murder, Beckford took the gun to the crime scene by placing it in the back waist of his pants. T.T. 402-403. While in the car on the way to the crime scene, in the presence of Petitioner, Davis indicated that he was going to "put lead in [Parham's] ass." T.T. 393. Based on these circumstances, the jury could have reasonably inferred that Petitioner was aware of the weapon and the purpose of the trip, and that he adopted and shared that purpose by volunteering to accompany Davis. See People v. Cotto, 176 A.D.2d 291, 292 (2d Dep't 1991) (finding defendant's conviction of murder in the second degree and attempted robbery in the first degree as an accomplice supported by legally sufficient evidence where evidence established that defendant was aware, before robbery, that robbery was intended, had agreed to act as lookout, and that defendant knew that co-defendant was armed and that co-defendant had threatened "to break . . . neck" of store proprietor).

Moreover, the evidence also establishes -- despite Petitioner's contentions to the contrary that he was merely present when the crime occurred -- that he actively assisted Davis and Beckford as a lookout and a getaway driver. The record reflects that Petitioner was told where and how to drive by Davis, both before and after the shooting and complied with those instructions; that, when a man believed to be associated with the victim approached the parking lot where the shooting was about to occur, Petitioner confronted him and succeeded in chasing him away; and that Petitioner later bragged about his exploits -- in the context of his co-defendants' bantering about how they shot the victim -- and explained that he "had to get" two more individuals. T.T. 247, 388-389, 393-394. Notably, at no point did Petitioner protest the actions of Davis and/or Beckford or express surprise at their actions, but rather reacted in a spirt of camaraderie before, during, and after the shooting. See generally People v. Coll, 157 A.D.2d 502, 503 (1st Dep't 1990) ("There was no evidence to indicate that defendant ever protested the actions of [the co-perpetrators], or even that [the defendant] acted surprised when they emerged from the building carrying television equipment. The People presented circumstantial evidence sufficient to prove beyond a reasonable doubt that the defendant was an accessory [to burglary and grand larceny] who shared the intent of the principal actors.") (internal citation omitted).

Based on the facts and circumstances of this case, a trier of fact could rationally find beyond a reasonable doubt that Petitioner aided co-defendants Davis and Beckford in the commission of the murder of Parham and that he did so with the intent or shared intent of killing the victim. Therefore, the Appellate Division, Fourth Department's adjudication of this claim did not contravene or unreasonably apply settled Supreme Court law. The claim is meritless and therefore dismissed in its entirety.

**V.   Conclusion**

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. No. 1) is denied, and the petition is dismissed. Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability. See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000). The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with

United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

					S/Michael A. Telesca

					_____
					HONORABLE MICHAEL A. TELESCA
					United States District Judge

DATED:	January 19, 2012
	Rochester, New York